Frank Butcher v. Commissioner. Thelma Butcher v. Commissioner.
Butcher v. Commissioner
Docket Nos. 16163, 16164.
United States Tax Court
1949 Tax Ct. Memo LEXIS 149; 8 T.C.M. (CCH) 633; T.C.M. (RIA) 49167; June 22, 1949
L. Karlton Mosteller, Esq., for the petitioners. Allen T. Akin, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: These *150 cases, consolidated for trial, involve income tax for 1943, deficiencies having been determined as follows: Name
Docket No.
Amount
Frank Butcher
16163
$4,650.91
Thelma Butcher
16164
4,650.91 The year 1942 is involved because of the Current Tax Payment Act of 1943. The issues for our determination are: (1) Whether the Commissioner erred in adjusting petitioners' distributive share of partnership income for 1942 and 1943 by disallowing an amount claimed as a deduction of equipment rental on a 1942 amended return of a joint venture, and allowing the deduction in 1943. (2) Whether the Commissioner erred in making an adjustment of partnership income on account of depreciation of a ditching machine, or whether petitioners are entitled to a deduction for 1942 of $7,892.93 under section 23(e)(1) of the Internal Revenue Code, in addition to the amount of $2,398.88 allowed by the Commissioner as depreciation for that year. From evidence, both documentary and oral, we make the following Findings of Fact The petitioners are husband and wife and own a community one-third interest in a partnership known as M. F. Fischer and Sons, of San Antonio, *151 Texas (hereinafter sometimes referred to as Fischer). Petitioners filed separate community property income tax returns for 1942 and 1943 with the collector of internal revenue for the first district of Texas. During the early part of 1942 Fischer and another partnership known as Farwell Company (hereinafter and sometimes referred to as Farwell) formed a joint venture to engage in various types of construction contracts. This joint venture was carried on during 1942 and 1943 (hereinafter sometimes referred to as the taxable years) and was known as Fischer-Farwell Company (hereinafter sometimes referred to as the joint venture). Fischer and Farwell each owned a one-half interest in the joint venture during the taxable years. Frank Butcher, one of the petitioners herein, was the managing partner of Fischer and participated in the formation of the joint venture with Farwell. The agreement was made in three or four different conferences prior to April 1, 1942, but was finally agreed to in April 1942. The substance of the agreement was that Fischer and Farwell would pool their equipment and resources in performing contracts on war camp jobs and would split any profits fifty-fifty. The *152 equipment rental was to be on a fifty-fifty basis and records were to be kept of equipment used on the jobs and be determined according to the "standard A.G.C. agreement," which the Government used at that time. For the years 1942 and 1943 Fischer, Farwell and the joint venture kept their books on an accrual basis and reported income on percentage of completion basis. During the taxable years the joint venture entered into certain construction contracts. The following schedule shows certain vital statistics in regard to these contracts: Percentage
Invoices showing the amount of rentals for
of comple-
equipment used by the joint venture
tion during
Fischer
Farwell
Name of contract
1942
1943
1942
1943
1942
1943
Camp Maxey
99
1
$ 1,996.50
$16,577.50
Dixon Airfield
99
1
1,224.50
$ 523.25
7,132.35
$ 618.75
Del Rio
90
10
10,439.38
9,461.00
5,911.50
3,842.50
Alien Enemy Camp
97
3
1,633.50
954.50
3,607.00
996.00
Stinson Field
100
5,745.25
455.00
452.50
Camp Fannin
100
25,370.62
26,620.38
Total
$21,039.13
$36,764.37
$33,680.85
$32,077.63 The invoices comprising the *153 amounts appearing in the schedule above were rendered to the joint venture about September or October 1943. In its original 1942 return, the joint venture showed its net income as $456,985.93. Fischer's and Farwell's distributive shares were $228,492.97 and $228,492.96, respectively. In an amended return for 1942, filed March 15, 1944, the joint venture showed its net income as $408,440.07. Fischer's and Farwell's distributive shares were there shown as $204,220.04 and $204,220.03, respectively. On March 15, 1944, the joint venture filed its 1943 income tax return, its net income being shown in an amount of $297,179.47. Fischer's distributive share of the joint venture's net income for 1943 was $148,589.73. Fischer and Farwell filed their original partnership returns for the year 1942 on March 15 and March 19, 1943, respectively, on which each reported its one-half of the net income of the joint venture as shown in the joint venture's original return. They (Fischer and Farwell) filed amended partnership returns for 1942 on March 15, 1944, on which each reported its one-half share of the net income of the joint venture as shown in the joint venture's amended return. No income from *154 rental equipment, as such, was reported on either the original or amended 1942 partnership returns filed by Fischer or Farwell. In their 1943 partnership returns under the caption "Equipment Rentals," Fischer reported income in the amount of $48,045.41 and Farwell reported income in the amount of $65,758.48. The only equipment rental expense incurred by the joint venture was paid either to Fischer or Farwell. Upon audit of the petitioners', Fischer's, Farwell's and the joint venture's 1942 and 1943 returns the Commissioner disallowed $65,802.25 equipment rental claimed as a deduction by the joint venture in its 1942 amended return and allowed the amount as a deduction to the joint venture in 1943 with the following explanations: SCHEDULE 1-A
Explanation of Items
Year ended 12-31-1942
(a) Additional income - $17,256.39
Ordinary income corrected
$474,242.32
Ordinary income reported orig-
inal return
456,985.93
Net adjustment above
$ 17,256.39
Ordinary income reported
amended return
$408,440.07
Equipment rentals expense dis-
allowed
65,802.25
Corrected ordinary income
$474,242.32
"Income is reported on the percentage of completion basis. *155 An amended return was filed for the year 1942 in which certain adjustments were made to income and expenses. The return as amended claimed equipment rentals as an expense in 1942. At the time the joint venture was organized there was no agreement whereby the joint venture was to pay equipment rentals to the parent companies M. F. Fischer and the Farwell Company, and no charges were made on the books of the joint venture for such expenses in 1942. Equipment rental agreement came into existence at the end of 1943 as a result of renegotiation of Government Contracts. For renegotiation purposes equipment rentals were charged as an expense by the joint venture to the different jobs and since the percentage of completion was used to determine income these equipment rentals charge as expenses to nearly complete contracts in 1942 had the effect of retroactive expense charge, and thereby reduced income in 1942. "Equipment rentals have been disallowed as an expense of the joint venture in 1942 based on the premise that no liability existed for the expense in 1942. The parent companies and the joint venture used the percentage of completion and the accrual basis for reporting income. The parent *156 companies returned all rental income received from the joint venture in 1943, although a part of this rental was actually used by the joint venture as an expense in 1942. * * *" SCHEDULE 3-A Explanation of Items Year ended 12-31-1943 (a) Decrease in income - $65,802.25. The above adjustment is a result of an adjustment made to the year 1942 in Schedule 1 and fully explained in Schedule 1-A. The effect of Commissioner's adjustments, above mentioned, increased the joint venture's original net income for 1942 in the amount of $17,056.39 and decreased the net income in 1943 by $65,802.25. As a result of the adjustment in the joint venture income the Commissioner increased the distributive share of the joint venture income of Fischer for 1942 in the amount of $8,628.19 and decreased the distributive share of joint venture income for 1943 in the amount of $32,901.12 with the following explanation in the statement mailed to Fischer: SCHEDULE 1-A
(b) Income from joint venture
$8,628.19
Corrected
$237,121.16
Reported
228,492.27
Difference
$ 8,628.89
The above amount represents additional income from the Joint Venture of Fischer-Farwell Company *157 of San Antonio, Texas. For further information see report submitted on the Joint Venture under even date. SCHEDULE 3-A
Explanation of Items
Year Ended 12-31-43
(b) Decrease in partnership income
$32,901.12
Reported
$148,589.73
Corrected
115,688.61
Decrease
$ 32,901.12
The above amount represents a decrease in income from the joint venture of Fischer-Farwell. For further information see report submitted on the joint venture under even date. Early in 1942 Fischer purchased an Austin Ditcher, known as W-501, Style 152, at a cost of $10,571.81. At the time of acquisition the machine was 24 years old. It was used during the year 1942 on various jobs. The last job was at Mineral Wells, Texas. It was at that time taken off the job and taken out of service, after which it was pulled onto certain railroad property. The machine has not been used since that time. After the machine was taken out of service, another machine that Fischer owned was used but it was not suitable for the job. Fischer purchased a new ditching machine at a cost of $14,700 about a month before the hearing of this case. At the time of the hearing of this case, the old machine was *158 still sitting on the same railroad property and, at some time prior to the hearing, Fischer acquired a lease on the ground where the machine was sitting. The ditching machine was never advertised for sale, but has been offered for sale from time to time. Fischer has had offers for the purchase of the machine. One offer was for junk, about two years ago, which was not accepted, due to the controversy the machine was in, and another recently from a firm that thought they had a buyer for it, but it was too big and heavy for the prospective purchaser's purpose. The junk value of the machine in December 1942 was about $300. The return and amended return of Fischer for 1942 disclosed no deductions except as included in costs or job costs. Upon audit of the Fischer 1942 and 1943 partnership returns, the Commissioner allowed total depreciation in the respective amounts of $15,171.40 and $16,173.20, with the following explanation in the statement sent to Fischer: SCHEDULE 1-A
(a) Excessive depreciation
$16,841.71
Claimed
$32,013.11
Allowed
15,171.40
Disallowed
$16,841.71
The above amount represents depreciation disallowed. * * * SCHEDULE 3-A
Explanation of Items
Year ended 12-31-1943
(a) Additional depreciation
$8,171.28
Claimed
$ 8,001.92
Allowed
16,173.20
Additional
($ 8,171.28)
*159 The above amount represents additional depreciation for the year. * * * Included in the allowances by the Commissioner as depreciation for 1942 and 1943 was an allowance of depreciation on the Austin Ditcher in the amount of $2,378.88 for the year 1942 and $2,114.56 for the year 1943. Upon audit of the petitioner's 1942 and 1943 individual income tax returns the respondent increased the petitioner's distributive share of the community property income from Fischer for the year 1942 in the amount of $15,635.73 and decreased 1943 community income in the amount of $13,690.80, with the following explanation in the notice of deficiency: EXPLANATION OF ADJUSTMENTS (a) Partnership income from M. F. Fischer & Son of San Antonio, Texas, has been adjusted as follows: Excessive depreciation, Exhibit A
$16,841.71
Joint venture adjustment, Fischer-
FarwellCompany-Texas, operations
1/2 of $65,802.25
32,901.13
Total additions
$49,742.84
Less decrease of income from con-
tracts
2,835.64
Net adjustment
$46,907.20
Your 1/3 of adjustment
$15,635.73
Explanation of Change: Equipment rentals of Fischer-Farwell Com-
pany disallowed in 1942, $65,802.25, and allowed
in 1943.
Your 1/6 interest
$10,967.04
Insufficient depreciation (Exhibit A)
2,723.76
Total reduction
$13,690.80
*160 Opinion (1) The first question for our determination is whether the Commissioner erred in adjusting petitioners' distributive share of partnership income for 1942 and 1943 by disallowing an amount claimed as a deduction of equipment rentals on a 1942 amended return of a joint venture, and in allowing the deduction in 1943. Actually the problem before us involves a deduction of a joint venture which is two business organizations removed from the petitioners herein. The petitioners are husband and wife and own a community one-third interest in a partnership referred to herein as Fischer. Fischer and another partnership known as Farwell Company joined together, early in 1942, to form a joint venture. This joint venture claimed a deduction for equipment rental in 1942, which is questioned by the respondent. As to the entire amount of the deficiency we start with the presumption that the Commissioner's determination is correct and the burden rests with petitioners to prove error. The Commissioner, in his notice of deficiency, has disallowed $65,802.25 equipment rental. From the evidence presented and brief filed we conclude that petitioners attempt to prove error only as to the amount *161 of $54,719.98. They argue, on brief, the applicability of sections 41 and 43 of the Internal Revenue Code, and Regulations 111, sections 29.41-2 and 29.43-2. The question, in the final analysis, resolves itself into one whether the amount here in question is a proper deduction in 1942. Petitioners contend that by reason of an oral agreement, entered into by the parties joining together to form the joint venture, the amount should be properly accruable for the year 1942. Respondent, on the other hand, argues that there was no agreement during 1942 to pay rental for equipment furnished by the co-adventurers. At this point, petitioners argue that there is no evidence to substantiate the respondent's position. As heretofore mentioned, the presumption of correctness rests with the respondent's determination and the burden is on the petitioners to prove error. Respondent, as early as the mailing of the notice of deficiency, contended that the joint venture was not operating during 1942 under any agreement whereby the joint venture was to pay equipment rentals to the partnerships involved. Even though the respondent has been explicit in this contention, petitioners *162 have not proved an agreement whereby they show the joint venture liable to pay equipment rental during the year 1942. They have proved an oral agreement, but it is of such an indefinite character that we have no way of determining when Fischer and Farwell became liable to the joint venture under the agreement or to what extent. Respondent contends that the liability did not accrue until 1943; petitioners have not proved otherwise. True, the equipment rental was to be on a fifty-fifty basis and records were to be kept of equipment used on the jobs and be determined according to the "standard A.G.C. agreement." But what is the "standard A.G.C. agreement?" How does it affect the agreement here in question? We have no way of making a determination. For all we know, it (the "standard A.G.C. agreement") may require the jobs to be completed before liability is determined, or any other number of ways, contrary to petitioners' contention. One fact that is before us is some indication that the "standard A.G.C. agreement" may have required the completion of the jobs before liability as to equipment rental, and that is that the invoices comprising the amounts claimed as equipment rental expense *163 were rendered to the joint venture about September or October 1943. If the liability accrued in 1942 we consider it strange that the partnerships would wait almost a year to render their invoices. Further, the partnerships (Fischer and Farwell) returned the income received as equipment rental in their tax returns for 1943 - yet petitioners ask the deductions for the joint venture for 1942. In any event, the burden is with the petitioners to prove their case and, as we view the evidence on this point, we are not convinced that they have proved liability as to the equipment rental as to 1942. As the respondent points out in his brief, the Supreme Court, in Security Flour Mills Co. v. Commissioner, 321 U.S. 28, states that: "It is settled by many decisions that a taxpayer may not accrue an expense, the amount of which is unsettled or the liability for which is contingent * * *." The deduction for equipment rental, here considered, was not accruable on the books of the joint venture until an agreement was entered into making the joint venture liable for the expense. The respondent says that no such agreement was shown to have been entered into until the end of 1943. Petitioners *164 fail to prove the joint venture's liability under the oral agreement, above mentioned, therefore, we hold that no such agreement is shown for 1942. Petitioners also argue that if the respondent's computation is adopted, it would produce a distorted income picture for each year. We can not agree. If there was no agreement upon which to base accrual in 1942 of the amounts of rental equipment, the income is not distorted by respondent's computation, since the books of the joint venture, as well as Fischer, were kept on the accrual basis. As has been pointed out, petitioners have not proved any basis to deduct the amounts in 1942. Both petitioners and the respondent agree that the corresponding amounts of the joint venture's deduction here in controversy were reported as income by the partnerships (Fischer and Farwell) during the year 1943. That fact is indication that the corresponding deduction of the joint venture should also be taken the same year. We, therefore, hold that the Commissioner did not err in disallowing the deduction for equipment rental for 1942 and allowing it for 1943. (2) The amended petitions alleged in general terms that Fischer had purchased a second-hand *165 ditching machine which with equipment cost $10,571.81, that it was used during 1942 up to about December 1, 1942, at which time all useful value was lost and it was permanently taken out of service and offered for sale; also that its net salvage value was $300; that "the difference between the cost and salvage value of this equipment at the time it was permanently taken out of service is an allowable deduction * * * for the calendar year 1942"; and that the respondent erroneously allowed depreciation with respect to the ditching machine in the amount of $2,378.88 in 1942 and $2,114.56 in 1943. It thus appears that the petition does not disclose whether the deduction as claimed is for loss or for depreciation. At the trial petitioner Frank Butcher testified as to the ditching machine that he "charged that machine off as depreciation in 1942"; also that he "charged the total cost of this machine off in 1942"; that it had not been used since; and that he had not claimed depreciation since 1942. Again he testified with reference to the ditching machine "I took the complete depreciation on it in 1942" and that as to when it was charged off on the books "I would say that would be probably *166 in January or February of 1943." Later he states that he does not know whether an entry was made but "it was charged off, not in its entirety in 1942." The return and amended return of Fischer for 1942 disclosed no deductions except as included in costs or job costs. Therefore, if complete depreciation was actually taken in 1942 it would be included in such costs. The Commissioner in deficiency notice allowed depreciation for 1942 in the amount of $15,171.40 and disallowed it in the amount of $16,841.71. The amount allowed included for 1942 $2,378.88 so that there is no affirmative showing of allowance of depreciation as such, in any greater figures. However, with the petitioner testifying that he had taken complete depreciation on the ditching machine in 1942, and that it was probably charged off in January or February of 1943, but again stating "it was charged off, not in its entirety in 1942" it is apparent that the record is inconclusive as to whether the petitioner actually received the benefit of full depreciation upon this machine in 1942. Assuming, however, that the only benefit from depreciation on the ditching machine was the $2,378.88 in 1942 and the $2,144.56 in 1943, both *167 as specifically allowed by the Commissioner, the record is still unsatisfactory as to whether petitioner has a right to any larger deduction than the figures last above stated; for assuming that the amended petition (the original petition did not mention the ditching machine) was intended to claim a loss through abandonment, the burden upon the petitioner was to prove such abandonment, and review of the record shows that such proof has not been made. Mere cessation of use is not abandonment. I. G. Zumwalt, 25 B.T.A. 566; Ewald Iron Co., 37 B.T.A. 798. The petitioner has not parted with title to the machine, but on the contrary leased property for its occupancy, on a railroad right-of-way. Assuming that efforts to sell for junk value would not negative abandonment, the record here merely indicates that the property "has been offered for sale off and on" without any indication as to the price sought for it. One offer was made "for junk," by which we assume is meant that the price offered was merely junk value, and a recent offer was made, without any showing as to what the offer was or the sales price sought. Obviously petitioner may have been seeking to sell *168 this property for much above junk value, and equally obviously such effort would have been a negation of intent to abandon the machine itself. Again the record shows that the offer "for junk" was "about two years ago which we did not accept due to the controversy the machine was in"; from which it appears that there has been controversy about this ditching machine, which unexplained is consistent with retention of ownership and may be inconsistent with abandonment. From all of this we can only conclude that the petitioners have failed to show abandonment of the ditching machine. The petitioners contend, however, in substance, that the ditching machine became worthless in 1942 and was permanently discarded and became useless and they cite and quote section 29.23(e)-3 of Treasury Regulations 111. [1] In our opinion, there is not proved here a case of "loss of useful value" to use the words of the heading of that regulation; for there is not shown here that "through some change in business conditions, the usefulness in the business of some or all of the assets is suddenly terminated"; nor is there shown here "proof of some unforeseen cause by reason of which *169 the property has been prematurely discarded, as, for example, where an increase in the cost or change in the manufacture of any product makes it necessary to abandon such manufacture * * *." The regulation moreover specifically states "This exception does not extend to a case where the useful life of property terminates solely as a result of those gradual processes for which depreciation allowances are authorized." Though it also further states that the exception applies "to machinery only when its use as such is permanently abandoned" we think this can not apply where there is, due to actual depreciation or deterioration, no "use" or "useful life" to be abandoned, but is intended to provide for cases where useful machinery is, as to use, abandoned because it is no longer economically wise to continue such use, for example, where the use of a machine, though it is still sound, is abandoned because a newer type of machine will do the same work much cheaper so that loss would be entailed in further using the older machine. There is illogic in the idea of abandonment of use of something which, due to time and wear, is useless - has broken down and will not work, as here. In our view, *170 this is a case where the useful life of the ditching machine terminated as a result of the gradual processes covered by depreciation allowances The machine was about 23 years old and despite repairs it would not function satisfactorily. We do not think the last quoted part of the regulation is intended to cover such a case as this, for it is clear that the ditching machine became useless because of its antiquity. Petitioners' right, therefore, in our view, was (unless he wished to sell the machine and take his loss) to claim and have depreciation allowed as it actually occurred. Frank Butcher testified positively that depreciation was taken in 1942, though again he stated that it was "charged off, not in its entirety in 1942" - a direct contradiction of his earlier testimony that he charged the total cost of the machine off in 1942. In this state of the record and regardless of whether there was a total charge-off in 1942 or allowance of depreciation, under job costs, in amounts greater than those specifically allowed by the Commissioner as depreciation, it is clear that this record is unclear as to whether the petitioners are entitled to relief, in the form of depreciation or as petitioners *171 argue loss upon abandonment; therefore, for lack of proof, we find no error in the Commissioner's treatment of the item as to the ditching machine. *172 Decision will be entered for the respondent. Footnotes
1. SEC. 29.23(e)-3. Loss of Useful Value. [As amended by T.D. 5458↩, approved June 15, 1945.] When, through some change in business conditions, the usefulness in the business of some or all of the assets is suddenly terminated, so that the taxpayer discontinues the business or discards such assets permanently from use in such business, he may claim as a loss for the year in which he takes such action the difference between the basis (adjusted as provided in section 113(b) and sections 29.113(a)(14)-1 and 29.113(b)(1)-1 to 29.113(b)(3)-2, inclusive) and the salvage value of the property. This exception to the rule requiring a sale or other disposition of property in order to establish a loss requires proof of some unforeseen cause by reason of which the property has been prematurely discarded, as, for example, where an increase in the cost or change in the manufacture of any product makes it necessary to abandon such manufacture, to which special machinery is exclusively devoted, or where new legislation directly or indirectly makes the continued profitable use of the property impossible. This exception does not extend to a case where the useful life of property terminates solely as a result of those gradual processes for which depreciation allowances are authorized. It does not apply to inventories. The exception applies to buildings only when they are permanently abandoned or permanently devoted to a radically different use, and to machinery only when its use as such is permanently abandoned. Any loss to be deductible under this exception must be fully explained in the return of income. The limitations provided in section 117 with respect to the sale or exchange of capital assets have no application to losses due to the discarding of capital assets. * * *